566 F.Supp. 546 (1983)
MISSOURI TERRAZZO COMPANY, INC., a Corporation, Plaintiff,
v.
IOWA NATIONAL MUTUAL INSURANCE COMPANY, a Corporation, Defendant.
No. 81-0500-C(5).
United States District Court, E.D. Missouri, E.D.
June 2, 1983.
*547 *548 Ben Ely, Jr., St. Louis, Mo., for plaintiff.
Jeffry S. Thomsen, St. Louis, Mo., for defendant.

MEMORANDUM OPINION
This matter was submitted to the Court on a stipulation of facts, exhibits, pleadings and depositions, and briefs of both parties. The Court now makes and enters its Findings of Fact and Conclusions of Law, and enters judgment for the plaintiff for $69,946.28.

FINDINGS OF FACT
1. Plaintiff, Missouri Terrazzo, is and was at all times relevant hereto, a duly organized and existing corporation in the State of Missouri engaged in the business of installing terrazzo floors and maintaining a place of business in the City of St. Louis, Missouri.
2. Defendant, Iowa National Mutual Insurance Company, is and was at all times relevant hereto, an Iowa corporation doing business in Missouri engaged primarily in *549 the insurance industry, and maintaining its principal place of business in Iowa.
3. The jurisdiction of this Court is based upon diversity of citizenship. The amount of controversy is in excess of ten thousand dollars ($10,000.00), exclusive of interest and costs.
4. Iowa National issued a policy of general liability insurance, No. CCC-80-111-896, insuring Missouri Terrazzo for the period December 31, 1975 to December 31, 1976. The general liability portion of the policy provides insofar as is pertinent:
ABodily Injury Liability
BProperty Damage Liability
The company shall pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
A. Bodily Injury or
B. Property Damage

To which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
5. Under "Definitions applicable to Comprehensive General LiabilityAutomobile Coverages," the policy states:
"Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

* * * * * *

"Property Damage" means (1) physical damage to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.
6. The Comprehensive General Liability coverage contains the following exclusions:
This insurance does not apply:
(a) to liability assumed by the insured under any contract or agreement except an incidental contract; but this exclusion does not apply to a warranty of fitness or quality of the named insured's products or a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner;
* * * * * *
(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from
(1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or
(2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;

(n) to property damage to the named insured's products arising out of such products or any part of such products;
(o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;
(p) to damages claimed for the withdrawal, inspection, repair, replacement, *550 or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;
7. The General Liability Insurance policy also contains a Contractual Liability Endorsement. The endorsement provides:
Coverage A  Bodily Injury Liability and Coverage B  Property Damage Liability also apply to liability assumed by the named insured under an insured contract, subject to the limits of liability and other provisions of the policy applicable to Coverages A and B, except as expressly modified by this endorsement.
* * * * * *
"Insured Contract" means
any written contract made prior to the occurrence giving rise to the bodily injury or property damage with respect to which indemnification is claimed, but insured contract does not include (1) an incidental contract, (2) a warranty of fitness or quality of the named insured's product, or (3) a warranty that work performed by or on behalf of the named insured will be done in a workmanlike manner.
8. In October of 1979 National Supermarkets first commenced suit against Missouri Terrazzo Company, Inc., among other defendants, in cause No. 79-1169-3(3), United States District Court, Eastern District of Missouri.
9. National Supermarkets' suit concerned the allegedly improper construction of a terrazzo floor and connecting structures in a supermarket. Defendant Hastings & Chivetta was the architect on the project. Defendant Spirtas was the demolition contractor and site preparation contractor. Defendant Missouri Terrazzo installed the concrete sub-bed and terrazzo topping of the terrazzo floor system. Defendant Swan Construction Company was the general contractor on the job. Dymon, Inc. was the company that provided an additive that was supposed to increase the strength of the concrete sub-floor.
10. Missouri Terrazzo Company, Inc. retained the law firm of Kortenhof & Ely to defend it in that lawsuit.
11. Cross-claims were filed by the following parties against Missouri Terrazzo on the following dates: Hastings & Chivetta, filed October 20, 1980 (Exhibit 1); Swan, filed January 28, 1980 (Exhibit 2); amended August 14, 1980 (Exhibit 3); Spirtas, filed May 28, 1981 (Exhibit 4); Dymon, Inc., filed April, 1981 (Exhibit 5).
12. Hastings & Chivetta filed a cross-claim against Missouri Terrazzo based on apportionment and indemnity. Hastings & Chivetta's expert testimony was aimed at proving Missouri Terrazzo's negligence in the construction of the floor.
13. Swan Construction Company, the general contractor, cross-claimed against Missouri Terrazzo based on apportionment of fault and its subcontract with Missouri Terrazzo. Swan Construction Company's president, Lou Swantner, whose deposition was taken July 10, 1980, testified that Missouri Terrazzo was required under the specifications to take a p.s.i. test to determine the strength of the sub-bed. He further testified that Missouri Terrazzo had failed to take such a test and that the p.s.i. did not meet the specifications.
14. Spirtas cross-claimed against Missouri Terrazzo for apportionment of fault and indemnity. Spirtas (in Daniel Cottin's deposition taken July 24, 1981) blamed the problems of the floor on Missouri Terrazzo's negligence. Spirtas' experts testified that the problems with the floor were due to Missouri Terrazzo's negligence in not providing a strong enough floor due to excessive air and water amounts and improper composition of the mix.
15. Dymon, Inc. filed a cross-claim against Missouri Terrazzo which was dismissed May 15, 1981 by the Court because Dymon, Inc. and Missouri Terrazzo were not co-parties. Dymon, Inc.'s expert depositions (taken April 30, 1981 and August 22, 1981) attacked Missouri Terrazzo's workmanship *551 and claimed that Missouri Terrazzo negligently prepared the floor, causing damages plaintiff sustained.
16. The depositions of National Supermarkets' experts state that in order to repair the floor it would be necessary to replace the soil fill under the entire floor structure in order to stop the settlement. The experts testified that removal and replacement of the portion of the floor provided by Missouri Terrazzo would be necessary. Further, replacement of all electrical fixtures contained within that floor, moving of the shelves, and placing of barricades would be necessary.
17. On the issue of damages, National Supermarkets' real estate experts stated that the damages attributable to floor faults resulted in a depreciation in the value of the building totaling $781,000. Exhibit 17, Preston Bank Report. Hastings & Chivetta's expert, Herring, stated that the loss in market value suffered by National Supermarkets was $250,000 due to the condition of the floor. Exhibit 19. Expert Shaughnessy, per his report, stated that the cost to replace the terrazzo floor would be $267,000. Exhibit 20.
18. The architects did not recommend replacement of the terrazzo floor because National Supermarkets became convinced that the settlement beneath the terrazzo floor was causing the cracking and other problems with the floor.
19. Missouri Terrazzo's work on the project occurred between July 19, 1976 and August 19, 1976. Cracking and discoloration of the floor became apparent in November of 1976. Iowa National Policy CCC-80-111-896 was in effect at the time of the construction of the floor and through December 31, 1976.
20. On August 1, 1980, Missouri Terrazzo's counsel telephoned Roger Lehr of the Lehr Insurance Company, the insurance agent who sold Iowa National Mutual Insurance Company's liability policy numbered CCC-80-111-896 to Missouri Terrazzo. Exhibit 6. Missouri Terrazzo's counsel advised Mr. Lehr during this telephone conversation of the pendency of the National Supermarket lawsuit.
21. On August 4, 1980, Missouri Terrazzo's counsel sent a letter to Roger Lehr (Exhibit 7) enclosing National Supermarkets' Second Amended Complaint (Exhibit 8).
22. Full cooperation was offered and afforded by Missouri Terrazzo to Iowa National in the investigation of the lawsuit and claim. Further information, orally and by letter, was provided as requested by Iowa National or its representatives. A conference between Missouri Terrazzo's counsel and Gene Bloodworth, Iowa National representative, took place on October 17, 1980, during which the lawsuit was discussed and copies of photographs, National's expert report, the subcontract, specifications, and all information requested by Iowa National was provided.
23. On November 18, 1980, Iowa National Mutual Insurance Company sent a letter to Missouri Terrazzo denying coverage because the relief in National's lawsuit was believed to be excluded under exclusions (a), (m), (n), and (o) of the insurance policy.
24. On December 24, 1980, Iowa National sent another letter to Missouri Terrazzo pertaining to its denial. Iowa National stated that the items in National Supermarkets' second amended complaint were not covered and did not meet the definitions of "occurrence" and "property damage" as contained in the policy.
25. On February 6, 1981, Missouri Terrazzo sent another letter to Iowa National, again stating that the charges of improper workmanship were incorrect, and that settling from underneath the floor and improper maintenance were the cause of the damage. Missouri Terrazzo asserted its belief that under the policy Iowa National was to provide a defense for the insured. Further, property damages and loss of use damages, such as incurred by National, were covered. By letter of February 23, 1981, Iowa National again denied coverage.
26. On December 28, 1981, National Supermarkets dismissed without prejudice its *552 suit against Missouri Terrazzo because no contract existed between National Supermarkets and Missouri Terrazzo, as Missouri Terrazzo was a subcontractor of Swan Construction Company on the job. Missouri Terrazzo remained in the suit as a third-party defendant by virtue of the cross-claims against it, and that was its posture in the lawsuit at the time of settlement.
27. On March 23, 1982, Missouri Terrazzo afforded notice by certified mail to Iowa National Mutual Insurance Company of its intent to negotiate a settlement for Missouri Terrazzo upon reasonable terms. Exhibit 15.
28. Settlement of the underlying suit was effected before trial in April of 1982 in the total amount of $268,000. Missouri Terrazzo's share of this settlement was $30,000 which was reasonable.
29. Total attorney fees expended by Missouri Terrazzo in defense of the underlying suit brought by National Supermarkets amounted to $28,110.50. Total costs of suit amounted to $11,835.78. These fees and costs were reasonable.
30. Missouri Terrazzo's share of the settlement, attorney fees, and costs of suit amounted to $69,946.28.
31. Attorney's fees and costs of bringing declaratory judgment action through July 30, 1982, have amounted to $2,115.65. This is a reasonable amount. Further fees and costs have been expended and will be expended until the conclusion of this suit and will be claimed as a part of this declaratory judgment.

CONCLUSIONS OF LAW
1. The Court has jurisdiction pursuant to 28 U.S.C. § 1332 because of diversity of citizenship and an amount in controversy exceeding $10,000. The parties concede, and the Court agrees, that the substantive law of Missouri applies under the circumstances of this case.
2. Under Missouri law plain and unambiguous language must be given its plain meaning. Howard v. Russell Stover Candies, Inc., 649 F.2d 620, 623 (8th Cir. 1981). The contract should be construed as a whole; but, insofar as open to different constructions, that most favorable to the insured must be adopted. Id.
3. The damage to National Supermarkets' floor does meet the definition of "occurrence." "Occurrence" is defined in the insurance policy as an accident. Courts have interpreted and applied the term "accident" as used in general liability insurance policies broadly, and have declined to limit its meaning to an event which happened suddenly and violently. St. Paul Fire and Marine Insurance Company v. Northern Grain Company, 365 F.2d 361, 365 (8th Cir.1966). The courts are practically agreed that the word "accident" means that which happens by chance or fortuitously, without intention or design, and which is unexpected, unusual, and unforeseen. Id.
4. Damages not intentionally inflicted but resulting from an insured's negligence may be caused by accident and within the coverage afforded by a liability insurance policy. White v. Smith, 440 S.W.2d 497, 508 (Mo.App.1969).
5. The fact that the claims involved breach of warranty or negligence do not remove them from the category of accident. Bundy Tubing Company v. Royal Indemnity Company, 298 F.2d 151, 153 (6th Cir.1962). Missouri Terrazzo would not be legally obligated to pay a claim arising out of an accident occurring without its negligence or breach of warranty. If the liability policy were construed to cover only accidents not involving breach of warranty or negligence, then no protection would be given to the insured. The insured would not need liability insurance which did not cover the only claims for which it could be held liable.
6. The damage suffered by National Supermarkets does meet the insurance policy's definition of "property damage." The floor, which is tangible property, physically deteriorated by cracking, settling, and flaking during the policy period. Further, to the extent that other parts of the building were not physically damaged, there was *553 loss of use of this tangible property because of an occurrence during the policy period.
7. Under Missouri law provisions designed to restrict coverage are to be construed most strongly against the insurer and to the favor of the insured; the insurer bears the burden of expressing its intention within such clauses by clear and unambiguous terms. Citizens Insurance Company v. Kansas City Commercial Cartage, Inc., 611 S.W.2d 302, 307 (Mo.App.1980). Exceptions to liability are to be construed to give the insured the protection which he reasonably has a right to expect. Jordan v. United Equitable Life Insurance Company, 486 S.W.2d 664, 666 (Mo.App.1972).
8. Exclusion (a) does not exclude coverage. By its plain and unambiguous language exclusion (a) does not apply to a warranty of fitness or quality of the named insured's products, or a warranty that work performed by the insured will be done in a workmanlike manner. Therefore, the Comprehensive General Liability insurance covers a warranty of fitness of the named insured's products and a warranty that work performed by the named insured will be done in a workmanlike manner.
9. The Contractual Liability Endorsement does not exclude the coverage of a warranty of fitness and a warranty that work performed will be done in a workmanlike manner which is provided in the General Liability Insurance policy. The Contractual Liability Endorsement states that liability will also apply to liability assumed by the named insured under an insured contract. The endorsement seeks to provide additional coverage not offered in the general policy. It does not represent a further exclusion of coverage. An insured contract is defined to not include a warranty of fitness or a warranty that the work performed will be done in a workmanlike manner. Although these warranty claims are not included here, they are covered by the general comprehensive liability provision where it is clearly provided that the contractual exclusion does not apply to a warranty of fitness or a warranty that work performed will be done in a workmanlike manner.
10. Exclusion (m) relating to the loss of use of tangible property is inapplicable and does not bar coverage. Initially, loss of use was believed to be an element of National Supermarkets' claim. However, National Supermarkets did not claim damages, nor did Missouri Terrazzo seek indemnification, based on the loss of use of tangible property. The damages claimed by National represent the difference between the value of the property before and the value of the property after the injury occurred. This difference represents a diminution in the value of the building.
11. This diminution in value was caused by a property damage as defined in the policy. The policy does not exclude coverage for diminution in value. If the policy had intended to exclude diminution in value it should have explicitly so provided. St. Paul Fire and Marine Insurance Company v. Northern Grain Company, 365 F.2d 361, 367 (8th Cir.1966). As it stands, explicit coverage of the present factual situation is, at best, ambiguous. Such ambiguity must, of course, be resolved in favor of the insured. Id.
12. Exclusions (n) and (o) are inapplicable and do not bar coverage. These exclusions bar coverage for property damage to the named insured's products or work arising out of such products or work. These exclusions make no reference to damage to property other than the insured's goods or other accidental loss resulting from the defective condition of the insured's work product. Therefore, these exclusions do not bar coverage for damages to property other than that of the insured. St. Paul Fire and Marine Insurance Company v. Northern Grain Company, 365 F.2d 361, 368 (8th Cir.1966).
13. Exclusion (p) is inapplicable and does not bar coverage. The plain meaning of this exclusion is that such damages are excluded from coverage only if the insured's products are withdrawn from the market or from use because of any known *554 or suspected defect or deficiency therein. Paper Machinery Corp. v. Nelson Foundry Co., 108 Wis.2d 614, 323 N.W.2d 160, 163 (Wis.App.1982); see also International Hormones, Inc. v. Safeco Insurance Company of America, 57 A.D.2d 857, 394 N.Y.S.2d 260, 261 (App.Div.1977). That is not the situation in this case. Missouri Terrazzo has not withdrawn its product from the market because of known or suspected deficiencies. There has been no product recall or preventive action taken. Further, this exclusion bars coverage for damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work; it does not bar coverage for claims of diminution in value.
14. Under Missouri law the duty of an insurer to defend its insured is broader than the duty to indemnify. Howard v. Russell Stover Candies, Inc., 649 F.2d 620, 625 (8th Cir.1981). "Where the allegations of a plaintiff's complaint, albeit ambiguous, state a claim which is potentially or arguably within the policy's coverage, the insurer must accept defense of the claim." Hartford Accident and Indemnity v. Krekeler, 491 F.2d 884 (8th Cir.1974). Because the loss suffered by National Supermarkets was covered by the insurance policy, Iowa National had a duty to defend Missouri Terrazzo.
15. The insured will be allowed to recover for a refusal to defend under an insurance policy when that refusal is vexatious. Mo.Ann.Stat. § 375.420. In order to prove that the refusal to defend was vexatious, the insured must show that the refusal was without reasonable or probable cause or excuse. Columbia Union National Bank v. Hartford Accident and Indemnity Company, 669 F.2d 1210 (8th Cir.1982).
16. Under the facts of this case, there was no vexatious refusal to defend when Iowa National failed to represent Missouri Terrazzo. To determine whether a refusal to defend was excusable or reasonable, the facts must be viewed as they would have appeared to a prudent person before trial. If the refusal appeared willful or unreasonable in this light, the insurer will be held liable to the insured under the statute. Id. National Supermarkets' second amended complaint alleged that as a direct result of Missouri Terrazzo's refusal and failure to correct and repair the deficiencies in its performance, the floor of the building cracked, crumbled, buckled, pitted, discolored, and sank causing damage in the sum of $750,000. Iowa National concluded that repair of the floor, in itself, was excluded from coverage under the policy by exclusions (n) and (o). Nowhere in National Supermarkets' second amended complaint was diminution in value alleged. There is no evidence that Iowa National knew or could have known at the time of its refusal to defend that National Supermarkets was claiming damages for diminution in value of the building. It appears that there was no indication of a diminution in value claim until the Preston Bank report of August 20, 1981. It is unclear whether Iowa National was ever apprised of this report. Accordingly, Missouri Terrazzo is not entitled to attorney's fees for bringing this declaratory judgment action pursuant to Mo.Ann.Stat. § 375.420. Accord Kissel v. Aetna Casualty and Surety Company, 380 S.W.2d 497 (Mo.App.1964).
17. Missouri Terrazzo, however, is entitled to reimbursement for attorney fees, expenses, and other damages in the suit brought by National Supermarkets. Iowa National was obligated under the insurance contract to defend Missouri Terrazzo. The failure to defend is a breach of contract and a reasonable or good faith belief that there is no coverage under the policy is no defense. Landie v. Century Indemnity Company, 390 S.W.2d 558, 562 (Mo.App.1965). The insurance company fails to defend at its peril. The universal rule which Missouri follows is that an insurance company is liable to the limits of its policy plus attorney fees, expenses, and other damages where it refuses to defend an insured who is in fact covered. Id. This is true even though the company acts in good faith and has reasonable ground to believe there is no coverage under the policy. Id. Thus, in the present case, Iowa National is *555 liable for the attorney fees, expenses, and settlement costs of Missouri Terrazzo in the suit by National Supermarkets because Missouri Terrazzo was in fact covered and Iowa National had a duty to defend. Accordingly, judgment is entered for Missouri Terrazzo in the amount of $69,946.28.